UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

GARY GAINES,                          )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        No. 4:18-cv-00238-RLY-DML
                                      )
ANCHOR GLASS CONTAINER                )
CORPORATION,                          )
                                      )
                    Defendant.        )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Gary Gaines, is a former employee of Anchor Glass Container

Corporation.  Following his termination, he brought the present action against his former

employer alleging discrimination in violation of the Age Discrimination in Employment

Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Family Medical

Leave Act ("FMLA"), as well as retaliation in violation of the ADEA and the FMLA.[1]

Plaintiff also alleges he was retaliated against for exercising his right to take workers'

compensation benefits, in violation of Indiana law.  Anchor Glass now moves for

summary judgment.  For the reasons explained below, the court **GRANTS** Defendant's

Motion.

I.      **Background**

        A.      **Plaintiff's Job Position**

Anchor Glass hired Plaintiff on October 10, 2001, at its Lawrenceburg, Indiana,

---

[1] Plaintiff withdrew his claim of retaliation under the ADA.  (*See* Filing No. 62).

plant.  (Filing No. 37-1 & Filing No. 45-2, Deposition of Gary Gaines ("Plaintiff Dep.") at 16).  He was forty-nine (49) years old.  (Filing No. 1, Compl. ¶ 20 (alleging Plaintiff was born in 1952)).  Plaintiff joined the Glass Molders, Pottery, Plastics & Allied Workers Union Local #42 thirty (30) days later.  (*Id.*).  Consequently, his employment was subject to the applicable collective bargaining agreement ("CBA") between the union and Anchor Glass.  (*Id.*).

During the time relevant to this case, Plaintiff held the position of journeyman maintenance mechanic on the "cold" side of the plant and reported to the facilities maintenance manager, David Plageman.  (*Id.* at 17; Filing No. 37-3 & Filing No. 64, Deposition of Dave Plageman ("Plageman Dep.") at 9; Filing No. 1, Compl. ¶ 5).  Plageman reported to the plant engineer, Liam Curtain.  (Plageman Dep. at 9).  Plageman and his employees were responsible for maintaining the production floor and the building—"parking lots and sewers and roof and painting and furnaces."  (*Id.* at 9).

### B.    Plaintiff's Injuries and Time Off

In June of 2011, Plaintiff hurt his right shoulder while shoveling glass and filed a worker's compensation claim.  (Plaintiff Dep. at 20; Plaintiff Dep. Ex. 1, Resp. to Interrog. No. 8).  He later reinjured his shoulder when he attempted to stop a piece of metal from hitting a coworker.  (Plaintiff Dep. at 20; Plaintiff Dep. Ex. 1, Resp. to Interrog. No. 8).  Plaintiff eventually required shoulder replacement surgery in March of 2013.

In December 2015, Plaintiff injured his wrists and ankle when he fell from a gangplank. (Resp. to Interrog. No. 8). He filed another worker's compensation claim in February 2016. He returned to work in May 2016. (Resp. to Interrog. No. 12).

In late July 2016, Plaintiff began another extended absence for carpal tunnel surgery. He returned to work in September 2016. (*Id.*).

### C.    Plaintiff's Work Violations

On December 15, 2015, Curtain advised Plaintiff to wear high visibility personal protective equipment ("PPE") when working in the warehouse. (Filing No. 37-4, Affidavit of Lindsay Glacken ("Glacken Aff.") at 2). Plaintiff refused. (*Id.*). He received a written counseling the following day for insubordination. (*Id.*).

On September 27, 2016, Plaintiff was observed operating a power lift without proper PPE—in this case, a hard hat and harness. (*Id.* at 3). He received a second step verbal warning from Plageman. (*Id.*).

### D.    Plaintiff's Termination and Reinstatement

On December 8, 2016, Plaintiff used a torch and cut-off wheel to cut a piece of pipe, causing a fire. (Plaintiff Dep. at 23; Plaintiff Dep., Ex. 3; Plageman Dep. at 13). Plageman issued him a second written warning for using the torch without first obtaining a hot work permit. (Plaintiff Dep., Ex. 3; Plageman Dep. at 13). Plaintiff testified Plageman was supposed to get the permit and told him to "take the hit" since Plaintiff had union protection and could be given his job back. (Plaintiff Dep. at 23-24). On December 14, 2016, Anchor Glass terminated Plaintiff's employment. (Plaintiff Dep. Ex. 4).

After Plaintiff's termination, Anchor Glass and the union proceeded through the grievance process outlined in the CBA.  (Plaintiff Dep. at 29).  On January 6, 2017, Anchor Glass agreed to reinstate Plaintiff through a Last Chance Agreement ("LCA"), which stated:

> The Company is placing Gary Gaines on a Last Chance Agreement which consists of one (1) safety violation for the remainder of the employee's employment with Anchor Glass Container.  In the event Gary Gaines violates this Last Chance Agreement, this will lead to termination of employment.

(Plaintiff Dep. Ex. 5).

### E.    Plaintiff Injures Himself and Files a Charge of Discrimination

In early February 2017, Plaintiff slipped on ice at work and hurt his head, neck, shoulder, and wrist.  (Plaintiff Dep. at 29-30; Resp. to Interrog. No. 12).  In March 2017, he filed another claim for worker's compensation benefits.  (*Id.*).  Plaintiff returned to work on July 9, 2017.  (*Id.*).

On May 30, 2017, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Anchor Glass terminated him in December 2016 because of his age.  (Filing No. 8, Def.'s Answer, ¶ 11).  Anchor Glass responded to the charge in August 2017 and the EEOC closed the charge on September 28, 2017.  (Filing No. 45-1, Declaration of Gary Gaines, ¶ 5 & Exs. 4, 5).

### F.    Anchor Glass Terminates Plaintiff for Violating the LCA

Anchor Glass has a lock-out/tag-out ("LOTO") policy which is designed "to ensure employees isolate machines from their energy sources and render them inoperative before any servicing or maintenance."  (Glacken Aff. at 8).  As part of the

policy, each employee has an individual lock and key assigned to him or her.  (Plaintiff

Dep. at 31).  No one else has a key to an employee's personal lock.  (*Id.*).  The LOTO

policy further provides that "[e]ach employee is required to remove their lock and tag

when leaving for the day."  (Glacken Aff. at 15).  Plaintiff could not do so without having

a supervisor's lock on the machine in place of his.  (Plageman Dep. at 38-39).  On

September 28, 2017, Anchor Glass maintenance employees, including Plaintiff, had

training on the LOTO procedures.  (Glacken Aff. at 7; Plageman Dep. at 47).

On October 3, 2017, Plaintiff was assigned to work on a machine with a 500-

horsepower electrical motor.  (Plaintiff Dep. at 31).  Prior to leaving for the day, Plaintiff

asked Plageman if he wanted Plaintiff to remove his lock from the machine under repair.

(*Id.* at 33).  According to Plaintiff, Plageman said "never mind, it's not important.  We'll

deal with it tomorrow."  (*Id.* at 34).

The next day, work on the machine continued.  (*Id.* at 34).  Before leaving for the

day around 2:30 p.m., Plaintiff again asked Plageman about substituting the supervisor's

lock.  (*Id.*; Filing No. 45-3, Declaration of David Torchia ("Torchia Decl."), Ex. 2).

Plageman told him "he didn't have time for it" and would "take care of it tomorrow."

(Plaintiff Dep. at 34; Torchia Decl., Ex. 2).  Plaintiff's co-worker, Rob Moorman, was

present and heard what Plaintiff said, but did not hear Plageman's response.  (Plaintiff

Dep. at 33-34; Torchia Decl., Ex. 2).

On the morning of October 5, 2017, the motor with Plaintiff's lock was ready to be

started.  (Plageman Dep. at 40).  Plageman had to follow a procedure to ensure that

Plaintiff was not at the plant which involved physical inspection and phone calls.  (*Id.* at

48; Plageman Dep. Ex. 5).  Plaintiff was not at work; he took intermittent FMLA leave

for physical therapy for his shoulder.  (Plaintiff Dep. at 34; Filing No. 37-2 & Filing No.

45-5, Deposition of Katie Petty ("Petty Dep.") at 52-53; Petty Dep. Ex. 6).  An outside

contractor hired by Anchor Glass to check the motor was unable to do any work on it

until it was safely powered up.  (Plageman Dep. at 48, 50; Petty Dep. at 23).  The lock

was eventually cut off.  (Plageman Dep. at 50).

On October 6, 2017, Plaintiff returned to work and was met by Katie Petty,

Anchor Glass's Human Resources Specialist.  Petty gave Plaintiff a disciplinary form

completed by Plageman stating Plaintiff had violated the LOTO policy by failing to

remove his lock on October 4, 2017.  (Plageman Dep. Ex. 6).  Plaintiff told Petty that

Plageman told him to leave his lock on the machine.  (Torchia Decl., Exs. 1, 2).

Plageman testified he does not remember saying that "because it's completely against the

training I had just given[.]"  (Plageman Dep. at 37-38).  Plaintiff brought up the fact that

he was off work on October 5, 2017 on FMLA, but Petty said that did not matter.  (Petty

Dep. at 22).  Plaintiff's union representative signed the disciplinary form, but Plaintiff

refused to sign it.  (Plageman Dep. Ex. 6).

On October 10, 2017, another fact-finding meeting occurred.  (Petty Dep. at 28).

In attendance were Vice President of Human Resources David Emmo, Lynn Owens from

Human Resources[2], Petty, Plageman, Curtain, Plaintiff, and union representatives.  (*Id*. at

28-29).  After Plaintiff and his union representatives left, Emmo, Owens, Petty,

---

[2] Owens's position is not clear from the designated evidence.

Plageman, and Curtain agreed that Plaintiff violated the terms of the LOTO policy and should be terminated.  (Petty Dep. at 28-29).  Although Petty's testimony does not mention Plant Manager Randy Becker's attendance at the meeting, it appears he was involved in the decision as well.[3]  (*See* Def.'s Answer to Interrog. No. 2 (stating the decision to terminate Plaintiff's employment was jointly made by Emmo and Plant Manager Randy Becker)).  Plaintiff was sixty-five (65) years old at the time.  (Plaintiff Dep. at 8).  The union and Anchor Glass proceeded through the grievance process.  At the third step meeting, Anchor Glass's position, which was advanced by Petty and Interim Plant Manager Felicia Lundy,[4] was ultimately accepted and the union withdrew the grievance without proceeding to arbitration.  (Glacken Aff. at 28-30; Petty Dep. at 40).

All other facts necessary for a resolution of this motion will be addressed in the Discussion Section.

## II.    Summary Judgment Standard

A court must grant summary judgment on a claim "where the admissible evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014); Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine"—precluding summary judgment—"only when the

---

[3] Becker was involved in Plaintiff's December 2016 termination and signed the LCA.  (*See* Glacken Aff. at 4; Plaintiff Dep. Ex. 5).

[4] A man named Kevin Montgomery was also present for the company.

evidence could support a reasonable jury's verdict for the non-moving party." *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 650 (7th Cir. 2011).  In evaluating a motion for summary judgment, the court views all evidence in the light most favorable to, and draws all reasonable inferences in favor of, the moving party.  *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

## III.   Discussion

### A.   Age Discrimination

The ADEA prohibits an employer from discriminating against an employee due to the employee's age.  29 U.S.C. § 623(a)(1).  Under a disparate treatment theory, an ADEA plaintiff must establish that his age was the "but-for cause" of his termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) (holding the ADEA only allows but-for, not mixed-motive, age discrimination claims).  This means the plaintiff must show that his age was not just a motivating factor in his employer's decision to terminate him; he must show it was the *determinative* factor.  *Id.* at 176; *Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010).

The central question on summary judgment is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  In answering this question, the parties—and thus the court—utilize the familiar *McDonnell Douglas* burden-shifting method.  This requires the plaintiff to first establish a prima facie case of age discrimination, which consists of four elements:  (1) he was a member of a protected age group (forty or older); (2) he was meeting his employer's

legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were substantially younger were treated more favorably. *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008). A plaintiff may satisfy the fourth element by showing that he was replaced by someone substantially younger. *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996). "Substantially younger" generally means ten years younger than the plaintiff. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003). If the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to come forward with a legitimate, non-discriminatory reason for the adverse action. *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 716 (7th Cir. 1999). If the employer provides such a reason, the plaintiff must show the employer's proffered reason was a pretext for age discrimination. *Id.*

Plaintiff's prima facie case turns on the fourth element. Employees are similarly situated if they are comparable to him "in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). At a minimum, he must show that he and his comparators "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 507 (7th Cir. 2017) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). The inquiry asks whether the comparators are sufficiently comparable to the plaintiff "to suggest [he] was singled out

for worse treatment." *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006).

Plaintiff claims he was treated differently than Kasey McClanahan,[5] Rob Mooreman, and Butch Beatty.  These men worked on the same machine as Plaintiff, were subject to the LOTO policy, and reported to Plageman.  (Plaintiff Dep. at 39-40; Plageman Dep. at 35).  Moreover, all three were substantially younger than Plaintiff. Moorman was 43; McClanahan was 28 and Beatty was 44.  (Def.'s Answer to Interrog. No. 4).  According to Plaintiff, they did not lock out the machine but were not disciplined.  (Plaintiff Dep. at 38-39).

Plageman testified he was not aware that McClanahan, Mooreman, and Beatty did not lock out the machine.  (Plageman Dep. at 56 (testifying he "didn't even know they didn't have their lock on it")).  Plaintiff insists Plageman and Curtain were aware of his comparators' failure to lock out the machine.  He says they were "over there several times looking at the work going on and never once mentioned about the locks not being on the lockout-tagout."  (Plaintiff Dep. at 38-39).  Furthermore, Plageman testified he did not remember Plaintiff's comparators coming to his office at the end of the day to get a company lock to replace their own.  (*Id.* at 56; *see also id.* at 56-57 ("Q: All three or four of them working on the machine would have had to do that, correct, switch out their lock for the company lock?  A: I believe so, yes.  Q: But none – that never happened?  A: Yeah.")).

---

[5] Plaintiff erroneously referred to him as "Casey McClatter."  (Plaintiff Dep. at 38).

Assuming for purposes of this motion that Plaintiff's comparators violated the

LOTO policy and Plageman was aware of the violation, Plaintiff's argument still fails.

The record reflects that the individuals Plaintiff names were not under last chance

agreements as of the time of Plaintiff's termination[6] and did not have a history of safety

violations.  (Def.'s Answer to Interrog. No. 5; *see also* Plaintiff Dep. at 39 (testifying that

to his knowledge, none of his comparators were under last chance agreements or had

been written up for safety violations)).  For these reasons, the alleged comparators are not

similarly situated to Plaintiff in all material respects.  *Simpson v. Franciscan Alliance,*

*Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) ("An employee who does not have a similar

disciplinary history and performance record as the plaintiff is not similarly situated.");

*Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) ("Without a

similar disciplinary history, [plaintiff] cannot be considered 'similarly situated.'"); *Burks*

*v. Wis. Dep't of Transp.*, 464 F.3d 750, 751-52 (7th Cir. 2006) (comparators not similarly

situated because they did not have a "comparable set of failings" as plaintiff).

Plaintiff also argues that he satisfies the fourth element because he was replaced

by someone substantially younger named Nicholas Hyde.  (Def.'s Answer to Interrog.

No. 6).  The record shows that Hyde, who was born in 1985, was hired as a maintenance

employee nearly five (5) months after Plaintiff's employment was terminated.  (*Id.*

(showing he was hired on February 27, 2018)).  There is no evidence that Hyde was hired

---

[6] In Defendant's Answer to Interrogatory No. 5, it lists Kasey McClanahan as having been issued a Last Chance Agreement for falsification of a company record during the current Human Resources Manager's (Lindsay Glacken) tenure (June 2018 to present).

11

into the "cold" side of the plant, where Plaintiff previously worked. Thus, Plaintiff's assertion that Hyde was hired to fill his position is based on nothing but speculation and conjecture.

As additional evidence of discrimination, Plaintiff asks the court to consider his December 2016 termination for failing to obtain a hot work permit. He asserts he was treated less favorably than Kevin Gregory, who was working by his side that day. Gregory was not fired even though he became very upset following the incident and left the plant without permission. (Plaintiff Decl., Ex. 1). He believes Gregory was "around 25" years old. (*Id.*). Plageman testified Gregory was not disciplined because "he was an apprentice. He's actually like a learner." (Plageman Dep. at 22). Because Gregory and Plageman held different job positions, Plaintiff is not similarly situated to Plageman.

For the reasons set forth above, Plaintiff has failed to raise a genuine issue of material fact on the fourth element of his prima facie case and the inquiry ends. *Gates v. Caterpillar*, 513 F.3d 680, 691 (7th Cir. 2008). Therefore, Anchor Glass is entitled to summary judgment on Plaintiff's age discrimination claim.

## B. Retaliation under the ADEA

The ADEA prohibits retaliation against an employee who opposes age discrimination. 29 U.S.C. § 623(d). To establish a claim for retaliation under the ADEA, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) the employer took a materially adverse action against him; and (3) there is a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455-56 (7th Cir. 2011).

To pin liability on Anchor Glass, Plaintiff must first show the decisionmakers from Anchor Glass knew about his EEOC charge of discrimination. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("In order to establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity[.]"); *Derosena v. General Bd. of Pensions & Health Benefits of United Methodist Church, Inc.*, 560 F.Supp.2d 652, 670 (N.D. Ill. 2008) ("A decisionmaker cannot retaliate against the employee if she is unaware of the complaints asserted against her.") (citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)).  The court is unable to determine from the designated evidence which decisionmakers had actual knowledge of Plaintiff's charge of discrimination but given Anchor Glass's response to the charge in August 2017, some certainly did.  (*See also* Def.'s Reply at 65 (stating "that some of the players involved in Plaintiff's termination may have known about a prior charge . . .")).

At any rate, Plaintiff blames his termination on Plageman who, he alleges, "heard about Plaintiff's EEOC charge" and "set the termination process in motion in October of 2017."  (Filing No. 61, Pl.'s Resp. at 19).  But Plageman did not have actual knowledge of the charge; rather, he heard rumors about the charge from his hourly subordinates. (Plageman Dep. at 33-34 (testifying he "heard rumors" from hourly workers in his group that Plaintiff had filed an EEOC charge of discrimination but does not remember hearing Becker, Curtain, or anyone in Human Resources mention it)).  Consequently, Plageman could not have exhibited a retaliatory intent based on Plaintiff's EEOC charge.

13

Plaintiff also asserts Anchor Glass terminated his employment "at the first opportunity following his return to work and shortly after the EEOC closed his age discrimination claim." (Pl.'s Resp. at 18). As noted above, a claim for retaliation requires the court to consider whether there is a causal connection between the filing of an EEOC charge—not when the EEOC closed his case—and the adverse employment action. Here, Plaintiff filed a charge of discrimination in May 30, 2017 alleging age discrimination, and he was terminated effective October 10, 2017. Thus, Plaintiff's discharge occurred nearly four and-a-half months after he filed his EEOC charge. "[W]hen so much time passes before the adverse action takes place, the order in which the events occurred does not by itself suggest a causal link between them." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (finding employee's charge of discrimination was not causally linked to her termination which occurred five months later). *See also Carter v. Chicago State Univ.*, 778 F.3d 651, 658 (7th Cir. 2015) (concluding five-month gap between complaint of discrimination and adverse action did not amount to suspicious timing); *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (finding four-month gap between filing of discrimination complaint and disciplinary letter were not causally linked). Plaintiff needs additional evidence from which an inference of retaliatory motive can be drawn. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) ("Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causation connection, especially in combination with other evidence."). As his additional evidence of retaliatory intent, Plaintiff argues he can establish that Anchor Glass's reason

14

for his termination was a pretext for discrimination.  But Plaintiff's entire pretext

argument centers around Plageman—i.e., that he was fired for following Plageman's

instructions.  (*See* Pl.'s Resp. at 13 ("[I]f jurors accept that Plageman told Plaintiff to

[leave the lock on the machine], the asserted justification for the termination

disappears.")).  As previously stated, Plageman did not have actual knowledge of the

charge of discrimination.  Anchor Glass is therefore entitled to summary judgment on

Plaintiff's ADEA retaliation claim.

### C.    Disability Discrimination

The ADA prohibits discrimination against a qualified individual "on the basis of

disability in regard to . . . discharge of employees[.]" 42 U.S.C. § 12112(a).  To succeed

on an ADA claim, an employee must show: "(1) he is disabled; (2) he is otherwise

qualified to perform the essential functions of the job with or without reasonable

accommodation; and (3) the adverse job action was caused by his disability."  *Monroe v.*

*Ind. Dep't of Transp.*, 871 F.3d 495, 503-04 (7th Cir. 2017) (citing *Roberts v. City of*

*Chicago*, 817 F.3d 561, 565 (7th Cir. 2016)).  The third element requires a plaintiff to

submit evidence showing his disability was the "but for" cause of his termination.  *Id*. at

504 (citing *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)

(holding "a plaintiff complaining of discriminatory discharge under the ADA must show

that his or her employer would not have fired him but for his actual or perceived

disability; proof of mixed motives will not suffice")).  But-for cause does not mean the

only cause of the adverse action.  *Carlson v. CSX Transp., Inc*., 758 F.3d 819, 828 n.1

(7th Cir. 2014).  "Rather, it means the adverse action would not have happened without the activity."  *Id.*

Due to shoulder injuries at work that led to a shoulder replacement, Plaintiff maintains he is substantially limited in "[w]orking above [his] head [and] lifting [his] arms up."  (Plaintiff Dep. at 40-41; Plaintiff Decl. ¶ 3 ("Although I was released to full duty in August of 2014, my doctor cautioned me about lifting anything heavier than 25 pounds.")).  Plaintiff was able to perform the essential functions of his job without an accommodation.  Plaintiff, however, submits no evidence of causation.  He simply states that "[i]t is for a jury to determine whether Anchor fired Plaintiff because of his disability or because he allegedly committed a safety violation by leaving his lock on a machine."  (Pl's Resp. at 22).  Because Plaintiff has failed to produce evidence tying his alleged disability to his termination, Anchor Glass is entitled to summary judgment on Plaintiff's disability discrimination claim.

### D.   FMLA Interference

The FMLA generally provides eligible employees suffering from a serious health condition with as many as twelve weeks of unpaid leave during any twelve-month period.  29 U.S.C. § 2612(a)(1)(D).  Employers are prohibited from both interfering with, *id.* § 2615(a)(1), and retaliating against, *id.* § 2615(a)(2), an employee's use or attempted use of FMLA leave.  The difference between these two theories is that a retaliation claim requires proof of retaliatory intent while an interference claim requires proof that the employer denied him entitlements provided under the Act.  *Kauffman v. Federal Exp. Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005).

16

To show a violation of the FMLA under an interference theory, a plaintiff must show that: (1) he was eligible for FMLA protection; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided appropriate notice of his intent to take FMLA leave; and (5) his employer denied him FMLA benefits to which he was entitled. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011) (quotation marks and citations omitted). An employee on FMLA leave has the right to be restored to the same or an equivalent position that he had before he took leave. 29 U.S.C. § 2614(a)(1); *see also* 29 C.F.R. §825.220(c) (". . . employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies"). This right is not absolute; an employer may "refuse to restore an employee to their former position when restoration would confer a 'right, benefit, or position of employment' that the employee would not have been entitled to if the employee had never left the workplace." *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001) (quoting 29 U.S.C. § 2614(a)(3)(B)). In other words, an employer may lawfully terminate an employee even when on FMLA leave "if the employer discovers misconduct that would justify termination had leave not been taken." *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir. 2009).

There is scant evidence in the record regarding Plaintiff's use of intermittent FMLA leave.[7] Based upon the absentee records attached to Plaintiff's declaration,

---

[7] In his statement of facts, Plaintiff barely addressed his FMLA leave. On page six of his Response he states: "Plaintiff was off work on FMLA leave for physical therapy for his

17

Plaintiff took intermittent FMLA leave off and on from December 1, 2014 until October 5, 2017. (Plaintiff Decl., Ex. 3). There is no evidence he was denied leave. In fact, he testified that once he was approved, he was permitted to use it. (Plaintiff Dep. at 43-44). As such, he received the leave to which he was entitled.

Plaintiff responds he was entitled to be restored to his job after he took leave on October 5, 2017. His argument can be boiled down to these three sentences:

> Plaintiff was absent from work on October 5, 2017 for time off under the FMLA. Because Plaintiff was on leave, he was unavailable to remove his lock from the machine that was undergoing maintenance. Anchor has improperly used Plaintiff's leave on October 5, 2017 as a negative factor in the decision to terminate his employment.

(Pl.'s Resp. at 24-25). But Plaintiff's lock would not have been on the machine had he removed it the day before as required by the LOTO policy. Plaintiff blames Plageman for his failure to remove the lock. Anchor Glass knew about this allegation, however, and dismissed it. As Petty explained in an October 16, 2017 email to Owens: "So if [Plageman] stated yes leave it on for the night that would still violate the rules set out in the lock out tag out claim." (Torchia Decl., Ex. 2). Because a violation of the LOTO policy was contrary to the terms of his LCA, Plaintiff's employment would have been terminated regardless of his FMLA leave. (*See* Petty Dep. at 22 ("It wouldn't matter if [the reason Plaintiff called off] was FMLA or if [he] called off for short-term disability, the [LOTO] policy wasn't followed.")). Anchor Glass is entitled to summary judgment on Plaintiff's FMLA interference claim.

---

shoulder" and that "[o]n October 6, 2017, [he] returned from his intermittent FMLA leave." (Pl.'s Resp. at 6).

### E.     FMLA Retaliation

To show a claim for retaliation under the FMLA, a plaintiff must establish that: (1) he engaged in statutorily protected activity; (2) Anchor Glass took adverse employment action against him; and (3) the protected activity caused the adverse action.  *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

Plaintiff maintains that Plageman, Curtain, and Becker retaliated against him for using FMLA and made "[c]omments about jobs that [he] normally [did].  And they would say you no longer can do them, that we don't know if you're going to be here the next day or not."  (Plaintiff Dep. at 44).  "To raise an inference of discrimination, comments must be '(1) made by the decision maker; (2) around the time of the decision, and (3) in reference to the adverse employment action.'"  *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007)).  There is no evidence of when these comments were made and there is no connection between the comments and the termination decision.

Moreover, Plaintiff's retaliation claim boils down to nothing more than temporal proximity—he took intermittent FMLA on October 5, 2017 and was terminated five days later.  Indeed, there is no evidence that Plageman knew Plaintiff was going to be taking FMLA for a physical therapy appointment on October 5, 2017, nor evidence that Plageman knew Plaintiff was on intermittent FMLA leave *before* he filled out the disciplinary form on October 6, 2017.  (*See* Plageman Dep. at 40 ("Q: Did you know the day before that Mr. Gaines was going to be gone the next day because of FMLA leave? A: No. Q: Did you know the day before that he wasn't going to be in the next day?  A:

19

No, sir, I did not."); *see also id.* at 41 (testifying that on October 5, 2020, he heard that Plaintiff "had called in for sickness")).  According to Petty, the subject came up at the first fact-finding meeting but even then, all Petty could remember was that Plaintiff had said he was going to be off work.  (Petty Dep. at 23 (testifying that at the first fact-finding meeting, "[Plaintiff] had said something like I won't be here tomorrow or something and Plageman did not recollect hearing that.")).  Likewise, there is no evidence that Curtain, Becker, or Emmo knew Plaintiff was taking FMLA or was otherwise going to be absent on October 5, 2017.  Even if Plageman, Curtain, Becker, and Emmo knew he would be taking FMLA leave on October 5, 2017, there is no evidence that Plaintiff's use of FMLA had anything to do with his discharge.  Plaintiff admitted that his grievance with the union was "thrown out" because "everyone relied on the last chance agreement." (Plaintiff Dep. at 36). Accordingly, Anchor Glass is entitled to summary judgment on Plaintiff's FMLA retaliation claim.

### E. *Frampton* Claim

Only one claim remains—Plaintiff's state law retaliatory discharge claim. Pursuant to 28 U.S.C. § 1367(a), the court may hear all claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  In the present case, the court will exercise supplemental jurisdiction over this claim as it arises from the same case or controversy.

Plaintiff's common law retaliatory discharge claim is commonly called a "Frampton" claim.  *Frampton v. Cent. Ind. Gas Co*., 297 N.E.2d 425 (Ind. 1973).  In the case from which it derives its name, the Indiana Supreme Court held that an employer

may not discharge an employee solely in retaliation for filing of worker's compensation claim. *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 212 (Ind. Ct. App. 2005).  To survive summary judgment on a *Frampton* claim, "an employee must show more than a filing of a worker's compensation claim and the discharge itself." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002).  Instead, an employee must present evidence which raises an "inference of causation between the filing of worker's compensation claim and the termination, such as proximity in time or evidence that the employer's asserted lawful reason for discharge is pretext." *Id.*

Plaintiff filed three worker's compensation claims and was off work for prolonged periods of time.  His last injury was in February 2017.  He filed for worker's compensation in March 2017 and returned to work on July 9, 2017.  He was terminated on October 10, 2017.  Thus, there was a seven-month gap between the filing of his worker's compensation claim and his termination.

Plaintiff attempts to fill the seven-month gap through his testimony that Anchor Glass "wanted [him] gone because [he] filed a number of claims for work injuries," and that Curtain and Plageman "told [him] management wanted him fired."  (Plaintiff Dep., Errata sheet).  But Plaintiff does not specify *who* wanted him gone or *when* these statements were allegedly made.  Without more, this testimony fails to bridge the gap.

Plaintiff also attempts to establish a causal connection with evidence of pretext, which requires him to raise a reasonable inference that Anchor Glass's explanation for the termination "was either dishonest or 'patently inconsistent with the evidence before the court.'" *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005) (quoting

*Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999)).  Here,

Plaintiff admits he signed the LCA which provided he would be terminated in the event

of a safety violation and further admits violating the LOTO safety procedures.  (Plaintiff

Dep. at 29, 34).  He fails to raise a genuine issue of material fact on whether Anchor

Glass honestly believed the reasons why it terminated him.  As Petty explained:

> We all had our discussion and it kept going back to the sheer fact that the
> Last Chance Agreement was not followed, which stated that you would not
> violate safety rules.   And a lock-out/tag-out needed to be followed
> completely, otherwise you are violating a safety rule.

(Petty Dep. at 28; *see also* Plaintiff Dep. at 36 ("Q: Did you file a grievance? A: Yes.

But it was – it was thrown out.  Basically, everybody relied on the last chance

agreement.")).  Therefore, Anchor Glass is entitled to summary judgment on Plaintiff's

*Frampton* claim.

IV.    **Conclusion**

      The court finds Defendant's Motion for Summary Judgment (Filing No. 37) should

be **GRANTED**.


**SO ORDERED** this 26th day of October 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.